**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| **ex rel. MWENDA MURITHI,** ) | |
| ) | **No. 14-cv-3090** |
| **Petitioner,** ) | |
| ) | **Judge Ronald A. Guzmán** |
| **v.** ) | |
| ) | |
| **KIM BUTLER, Warden,** ) | |
| **Menard Correctional Center,** ) | |
| ) | |
| **Respondent.[1]** ) | |

## ORDER

Petitioner Mwenda Murithi's § 2254 Petition for Writ of Habeas Corpus [1] is denied. No certificate of appealability shall issue.

## MEMORANDUM OPINION AND ORDER

Mwenda Murithi ("Petitioner") was convicted of first degree murder in February 2009 after an Illinois state court jury trial. He has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254(b)(1). For the reasons set forth below, the Court denies the petition.

### Factual Background

The following facts relevant to Petitioner's § 2254 petition are drawn from the Illinois Appellate Court's opinions in Petitioner's direct appeal, *People v. Murithi*, No. 1–09–1147 at 2-5

---

[1] Ms. Butler is the current warden of the Menard Correctional Center, where petitioner is incarcerated. Thus, the Court substitutes Ms. Butler for Rick Harrington as the respondent. *See* Rules Governing § 2254 Cases, Rule 2a (stating that a § 2254 petition "must name as respondent the state officer who has custody [of the petitioner]").

(Ill. App. Ct. Dec. 30, 2010) (Gov't Ex. D, Dkt. # 24, Page ID # 250-71), and collateral appeal, *People v. Murithi*, 2013 IL App (1st) 120924-U at ¶¶ 5-26 (Ill. App. Ct. Sep. 19, 2013) (Gov't Ex. L, Dkt. # 24, PageID # 511-20.) The Court presumes that the state court's factual findings are correct for the purposes of habeas review, and Petitioner bears the burden of rebutting such findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner was a member of the Imperial Gangsters street gang, and was charged along with fellow Imperial Gangster Tony Serrano for the murder of 13 year old Schanna Gayden. The victim was killed on June 25, 2007 when she was shot inadvertently while walking past a confrontation between the Imperial Gangsters and members of the rival Spanish Cobras gang.

Prior to trial, Petitioner moved to suppress statements he made to the police while in confinement on the grounds that they were involuntary and coerced. At the evidentiary hearing on the motion to suppress, Detective John Valkner ("Valkner") testified that he arrived at the scene of the shooting on the evening it happened. Once at the scene, he learned that a young girl had been shot in the head, but was still alive and hospitalized. Beginning at 2:10 a.m., Valkner and another detective conducted an unrecorded interview of Petitioner. At 3:55 a.m., the Cook County Medical Examiner's Office notified Valkner that the victim had died. Valkner then contacted the hospital to confirm the time of death, which he learned to be 12:10 a.m. The video recording equipment in the interview room was then turned on at 4:02 a.m., and remained on for two additional interviews between Petitioner and the police. After hearing this evidence, the trial court denied Petitioner's motion to suppress, finding that the statements given to the police during questioning were voluntary. The trial court also specifically found that the officer's

decision regarding when to turn on the video recording device was not a violation of Petitioner's constitutional rights.

Following the court's ruling on this and other pretrial motions, Petitioner's trial began. During opening statements, Petitioner's counsel advised the jury that Petitioner was not required to prove his innocence or testify at trial on his own behalf. However, counsel made numerous statements indicating that Petitioner would testify during the trial. Counsel stated: "But I fully anticipate you are going to hear from Mr. Murithi. I fully anticipate him sitting up there like every other witness and telling you what happened." Counsel went on to make the following comments during his opening:

> Mr. Murithi is going to sit up there, I believe. And when he does, he is going to tell you what happened out there, what he was doing out there…In the summer of 2007, yea, he is going to tell you that he was a member of the Imperial Gangsters in that neighborhood. And you may not like that. You may not like him. He is going to tell you he was out there that night looking for a fight with the Cobras. He had some troubles with them. He was looking for a fist fight. He is going to be very specific about that. He was throwing down gang signs. He was egging them on. He wanted to get in a fist fight with those guys.
> He is going to tell you he likes to fight. He is going to tell you he made a phone call. The phone call wasn't to bring a gun to the scene. He is going to tell you that the phone call was to get more bodies out there because he saw he was getting outnumbered. He is going to tell you he saw Tony Serrano coming and he knew by the way that Tony Serrano was holding his waistband he had a good feeling that Tony Serrano brought a gun. He is going to tell you he didn't want a gun out there. Once he saw it he had to deal with it. Says all right. Things get out of hand. I know at least it's there. I don't want it here. He is going to tell you he doesn't want it. He didn't want it there because it was 6:00 o'clock in the evening and there were kids playing out there and that's just not smart to play with guns when there are that many people out there. He didn't want the gun out there. He didn't need it. He wanted to fist fight. He tried to get the gun away from Tony Serrano.

Following opening statements, the parties presented their evidence. The evidence at trial established that at around 6:30 p.m. on June 25, 2007, Katie Wilson and her 13 year old cousin, Schanna Gayden, went to Funston Park to buy fruit. Wilson testified that she heard two groups of men arguing at each other across a street. The group on Wilson's side of the street was yelling

"Cobra killer." The argument got louder and then Wilson heard gunshots. When Wilson turned around, she saw Gayden lying on the ground. Gayden later died at the hospital of a gunshot wound to the head.

Several witnesses testified regarding Petitioner's involvement in the shooting. Felix Jusino testified that he was a member of the Imperial Gangsters in June 2007. About 20 minutes before the shooting, Jusino ran into Petitioner. Petitioner told him there were some Cobras nearby and asked Jusino to come with him. When Jusino refused, Petitioner left. While at a store, Jusino heard people yelling "Cobra killer" outside and went to see what was happening. He saw Petitioner arguing with some Cobras standing across the street. Petitioner was yelling "Cobra killer" and making a hand signal called "dropping the C" as a sign of disrespect. Jusino noticed that Petitioner was with Tony Serrano, who was also a member of the Imperial Gangsters. Petitioner stood in front of Serrano yelling at the Cobras across the street while Serrano went behind a car. When Serrano stepped out from behind the car, he started shooting towards the Cobras and then ran. Jusino said he saw a pistol in Serrano's hand as Serrano ran past him.

Jacoby Jones testified that he was walking with his sister near the park when he saw Petitioner. Petitioner was yelling "Cobra killer" and flashing gang signs at several Spanish Cobra gang members standing across the street in the park. When Jones saw Petitioner raise his hand to his mouth and say "Bring the thumper," which Jones knew to be a slang term for a gun, Jones picked up his sister and ran to his house. A few seconds after going upstairs, Jones heard six to eight gunshots. Jones identified Petitioner in a photo array and a lineup as the person who said "Bring the thumper."

Roquelin Bustamante testified that on June 25, 2007, he saw three black males, including Petitioner, walking towards Central Park Avenue. All of the men were flashing gang signs and yelling at four men standing on the other side of the street. Bustamante saw a Hispanic male come out from behind a parked car, while hiding something in his shirt. Petitioner was yelling at the men across the street to come closer. Bustamante said that when the Hispanic male who came from behind the car pulled a gun out from under his shirt, Petitioner waived at the gunman and told him to "wreck 'em." The gunman then started firing. Bustamante identified Petitioner in a lineup as the person who told the gunman to "wreck 'em."

Chicago police officer Edwin Pagan[2] testified that he found Petitioner about a half block down from the park while canvassing the area after the shooting. Petitioner was standing outside drinking an alcoholic beverage. After Officer Pagan placed him under arrest for drinking on a public way, Petitioner told the officer to give him a break because he had information. According to Officer Pagan, Petitioner said he knew where the "thumper" used in the shooting was. Petitioner told the officer it was located in a partially abandoned building at Dickens and St. Louis Avenue. After being advised of his Miranda rights, Petitioner told Officer Pagan he knew the shooter was an Imperial Gangster named Tony.

Chicago police detective John Valkner testified that he questioned Petitioner at 2:10 a.m. on June 26, 2007. After being advised of his Miranda rights, Petitioner told Detective Valkner that he was a member of the Imperial Gangster street gang. Petitioner admitted that prior to the shooting, he was in an argument with some Cobras who were across the street from him on Central Park Avenue. Petitioner denied, however, that he ordered the gun to be brought out. He

---

[2] The Illinois Appellate Court's opinions list the officer's name as "Edwin Page," but this appears to be a typographical error as both Petitioner and the government refer to the officer as Pagan.

told Valkner he just wanted to fight the Cobras, and ran as soon as Serrano started shooting. After Valkner learned the victim had died at 3:55 a.m., he turned on the video recording system in the interview room where Petitioner was being questioned for the remainder of the time Petitioner was there. The police conducted two additional interviews of Petitioner after 3:55 a.m., both of which were recorded.

The video containing Petitioner's recorded statements was played for the jurors, who were also given transcripts of the dialogue. In the video, Petitioner is advised of his Miranda rights. When asked what happened on the evening of the shooting, Petitioner stated that a Cobra pointed a gun at him, after which Petitioner got into a verbal altercation with several Cobras. Petitioner stated that he just wanted to have a "boxing match real quick" and that he likes fighting. Petitioner admitted to making calls to get more gang members there for a fight, but not for a shooting. He admitted that he had been in two previous fights with the Cobras and he was trying to "even it up" and get the "upper hand" with this fight.

Petitioner stated that three or four other Imperial Gangsters showed up for the fight. Petitioner inquired of them "ya'll got thumper?" and Serrano responded that he had a gun. Petitioner could also tell Serrano had a gun by the way he was walking and holding his hand. Petitioner's testimony was inconsistent as to how he felt about the presence of a gun at the fight; he repeatedly denied calling for the gun and stated "I don't like bringing guns out at that hour, there's too many kids outside. I always wait until midnight before I bring out guns…Cause I know I can aim, but I don't know about the other people man that's why I don't be lifting that s*** at that time." Later in the interview, however, Petitioner stated that when he realized Serrano brought a gun, "I was like, yes we got a gun here too. This evens everything's [sic] out."

Petitioner admitted he was happy to have a gun there, because "[i]n case dude starting lighting us up f*** it, we gonna light you back up."

Petitioner stated that he was planning to "wait for [the armed Cobra] to shoot first" then "light him back." There was "gonna be a shootout. It ain't no fun shooting a n***** without no gun. A shootout's the best way 'cause in the hood that's just a homicide."[3] Petitioner denied telling Serrano explicitly to shoot, but admitted that he told Serrano to "get 'em" or "bust them." Petitioner eventually admitted that he was trying to lure the Cobras closer, as Serrano was "gonna get an easier target like that." He told Serrano to "bust at these n*****s as soon as we got closer to Central Park." Petitioner then stated he asked Serrano for the gun when Serrano hesitated to shoot, and that he was "mad as hell" at the time and, if he had the gun, he would have shot at the Cobras just for crossing the street.

After playing the video, the State rested. When asked if Petitioner would testify on his own behalf, defense counsel informed the judge that he would not. The trial court judge then questioned both defense counsel and Petitioner about this decision. Counsel reported that he had "spoken to [Petitioner] at great length about his absolute right to testify in his own behalf." Counsel also stated that he had informed Petitioner that if Petitioner testified, counsel would ask that the jury to be instructed to treat the testimony like that of anyone else; if Petitioner did not testify, counsel would ask for an instruction that the jury could not hold the fact that he failed to testify against him. Counsel concluded that "at this point, it is [Petitioner's] desire not to testify on his own behalf." When asked by the judge if this was correct, Petitioner responded "Yes, it is" and confirmed in response to separate questions that: (1) he had talked the matter over

---

[3] Petitioner now contends that his actual words were "that's *justifiable* homicide" rather than "that's just a homicide" and that the Appellate Court misquoted him when it reviewed the video. (Reply, Dkt. # 27, at 1.) While his assertion is plausible, the difference is not relevant to any of the claims in the current habeas petition.

extensively with counsel; (2) he had no questions regarding his decision not to testify; (3) he was confident in making his own decision and no one had threatened him or promised him anything in order to influence his choice not to testify; (4) he was choosing not to testify of his own free will; and (5) he understood that the decision was his alone to make.

After hearing all the evidence, the jury found Petitioner guilty of first degree murder. Following a joint sentencing hearing, Petitioner was sentenced to a 55–year prison term.

## Procedural Background

On direct appeal, Petitioner argued that (1) trial counsel was ineffective for failing to question prospective jurors about gang bias; (2) the trial court violated his right to trial by an impartial jury, because the judge failed to comply with Illinois Supreme Court Rule 431(b) in not affording each potential juror the opportunity to express their acceptance of the principles in *People v. Zehr*, 469 N.E.2d 1062 (Ill. 1984);[4] and (3) his sentence was excessive. (Gov't Ex. A.) In a written opinion issued December 10, 2010, the Illinois Appellate Court affirmed Petitioner's conviction, rejecting claims one and three as meritless and claim two as procedurally defaulted because Petitioner had not raised this issue either at trial or in his post-trial motions. (Gov't Ex. D.)

Petitioner then filed a Petition for Leave to Appeal ("PLA") to the Illinois Supreme

---

[4] Illinois Supreme Court Rule 431(b) was adopted to ensure compliance with *Zehr*, and reads:
> The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

IL R. S. Ct. 431(b).

Court. This PLA raised only Petitioner's claim that the trial court failed to satisfy the Illinois rule requiring a judge to ask jurors whether they accept the *Zehr* principles. (Gov't Ex. E.) The Illinois Supreme Court summarily denied Petitioner's PLA on May 25, 2011. (Gov't Ex. F.)

On November 18, 2011, Petitioner filed a pro se petition asking the Circuit Court of Cook County to vacate his conviction on collateral review. (Gov't Ex. G.) In it, Petitioner raised the following claims: (1) trial counsel was ineffective for (a) promising in opening statements that Petitioner would testify yet preventing him from doing so, (b) failing to investigate or challenge the admissibility of Petitioner's statements to Pagan, (c) failing to move to suppress Petitioner's unrecorded statements to Valkner, (d) failing to object when Roquelin Bustamante testified that Petitioner "ordered" the shooting, and (e) failing to challenge Petitioner's statements to both Pagan and Valkner in post-trial motions; (2) appellate counsel was ineffective for failing to raise on direct appeal the ineffective assistance claims based on the failure of trial counsel to challenge the statements to Pagan and Valkner; and (3) he was not proven guilty beyond a reasonable doubt. (Gov't Ex. G.) The Circuit Court of Cook County rejected all these claims in a reasoned opinion issued February 18, 2012. (Gov't Ex. H.)

Petitioner then secured an attorney to assist with his collateral review proceedings, and filed a counseled appeal to the Illinois Appellate Court claiming that: (1) trial counsel was ineffective for failing to challenge his unrecorded statement to Valkner; (2) trial counsel was ineffective for making an unfulfilled promise in his opening arguments that Petitioner would testify; and (3) appellate counsel was ineffective for not raising argument (2) on direct appeal. (Gov't Ex. I.) On September 19, 2013, the Illinois Appellate Court affirmed the Circuit Court's dismissal and rejected as "frivolous and meritless" all of Petitioner's claims. (Gov't Ex. L.)

On September 24, 2013, Petitioner's attorney filed a PLA to the Illinois Supreme Court, renewing only Petitioner's claim that trial counsel was ineffective for failing to move for suppression of his unrecorded statements to Valkner. (Gov't Ex. M.) At some point around this time, Petitioner attempted to file a supplemental pro se PLA alleging that trial counsel was ineffective for making an unfulfilled promise to the jury that Petitioner would testify. (Gov't Ex. R.) On October 24, 2013, the clerk of the Illinois Supreme Court sent Petitioner a letter informing him that his attempted pro se PLA was being returned unfiled, on the grounds that Petitioner was represented by counsel in his post-conviction proceedings and could not also file pro se documents. (Gov't Ex. S.) On November 27, 2013, the Illinois Supreme Court summarily denied the counseled PLA. (Gov't Ex. N.)

On April 25, 2014, Petitioner filed this pro se federal habeas petition arguing that: (1) his trial counsel was constitutionally ineffective, because counsel: (a) did not move to suppress Petitioner's statements to Valkner as involuntary and unrecorded in violation of Illinois law, (b) promised in his opening statements that Petitioner would testify yet failed to keep that promise, and (c) failed to screen potential jurors for gang bias; (2) his appellate counsel was constitutionally ineffective for (a) failing to argue on direct appeal that trial counsel was ineffective for making an unfulfilled promise that Petitioner would testify, and (b) failing to argue on direct appeal that trial counsel was ineffective in failing to move for suppression of Petitioner's statements to Valkner; and (3) the trial court violated Petitioner's right to due process by not asking potential jurors whether they understood and accepted the *Zehr* principles as required by Illinois law.

# **Legal Standard**

The role of a federal court in reviewing habeas applications by state prisoners is delineated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which was enacted to limit federal habeas review. *See Williams v. Taylor*, 529 U.S. 362, 403-04 (2000) (noting that in enacting AEDPA, "Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law"). The ruling this Court reviews is that of the last state court to rule on the merits of Petitioner's claims. *See Suh v. Pierce*, 630 F.3d 685, 690 (7th Cir. 2011).

Under AEDPA, a state prisoner is entitled to habeas relief only if the state court's ruling on his federal claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Under the "contrary to" prong of this test, a federal court may issue a writ of habeas corpus only if the state court applied a rule different from the governing law set forth in the relevant United States Supreme Court's precedent, or if the state court decides a case differently than the Supreme Court has already done on materially indistinguishable facts. *See Williams*, 529 U.S. at 405-06. Under the "unreasonable application" prong, a federal court may only provide habeas relief if the state court correctly identified the governing legal principle but applied that principle to the facts in an unreasonable way. *Id.* at 407-08. This is an objective inquiry; if the state court's application of the law is such that "fairminded jurists could disagree," habeas relief is precluded. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Under either prong, a petitioner bears the burden of demonstrating that he or she is entitled to the relief sought. *See Woods v. Visciotti*, 537 U.S. 19,

25 (2002). The state court's findings of facts are "presumed to be correct," and such presumption can only be rebutted with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Moreover, a federal court may address a petitioner's claims on the merits only if such claims are not barred by procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There are two general cases in which a claim is barred by procedural default: (1) where a petitioner failed to fairly present a federal constitutional issue in the state courts first, *Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996); and (2) where a state court has rejected a petitioner's claim on an adequate and independent state procedural or substantive ground, *Coleman*, 501 U.S. at 729-30. A petitioner may be excused from a procedural default if he or she can show cause for the default. *See Schaff v. Snyder*, 190 F.3d 513, 526 (7th Cir. 1999). Cause sufficient to excuse a procedural default is defined as "some objective factor external to the defense" which hinders the petitioner's ability to pursue a claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

### Discussion

For the following reasons, Claim 1(a) (ineffective assistance of trial counsel in failing to move to suppress Petitioner's statements to Valkner) fails on the merits. To the extent Claim 1(b) (ineffective assistance of trial counsel for the unfulfilled promise to testify) is not procedurally defaulted, it also fails on the merits. Claim 1(c) (ineffective assistance of trial counsel for failure to question jurors about gang bias) is procedurally defaulted because Petitioner failed to pursue this claim through one full round of state court proceedings and cannot show cause excusing this default. Claims 2(a) and 2(b) (ineffective assistance of appellate counsel) fail on the merits.

Finally, Claim 3 (failure of the trial judge to give jurors the opportunity to agree with the *Zehr* principles) is not cognizable in a federal habeas proceeding because it relies solely on an alleged violation of state law.

CLAIM 1: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Ineffective assistance claims are evaluated using a two-pronged test: (1) whether counsel's performance fell below the objective standard of reasonable representation under the circumstances, and (2) whether there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984). Where a petitioner's claim fails under either of the prongs, the court may reject his claims on that basis and need not address the remaining prong. *See Milone v. Camp*, 22 F.3d 693, 703 (7th Cir. 1994) ("The Court need not address both *Strickland* prongs if it is clear that [Petitioner] cannot satisfy one of them").

**Claim 1(a): Failure to suppress statements to Valkner**:

Petitioner's first ground for relief is that trial counsel was ineffective for failing to file a motion to suppress Petitioner's unrecorded statements to Valkner. The Illinois Appellate Court was the last court to reject this claim in a reasoned opinion, and correctly identified the *Strickland* standard for ineffective assistance. (Gov't Ex. L, *People v. Murithi*, 2013 IL App (1st) 120924-U at ¶¶ 37-40.) Accordingly, Petitioner must show that the state court unreasonably applied *Strickland* to the facts of his case.

The Illinois Appellate Court found that Petitioner's statements were admissible, and therefore concluded that counsel's failure to move to suppress them was not deficient under *Strickland*. (*Id*. at ¶ 51.) Illinois law provides generally that statements in a homicide investigation are inadmissible unless recorded, but contains an exception for unrecorded statements made before interrogators knew a victim had died. 725 ILCS 5/103-2.1(e)(viii) ("Nothing in this Section precludes the admission of a statement given at a time when the interrogators are unaware that a death has in fact occurred"). The appellate court found it "clear from the record" that Valkner did not learn of the death of Schanna Gayden until 3:55 a.m. – and that detectives promptly turned on the recording device only minutes after having gained that knowledge. (Gov't Ex. L, at ¶ 50.) The court rejected Petitioner's argument that the police kept themselves "purposefully ignorant" of the death in order to avoid the recording requirement, because this claim was unsupported by any evidence in the record. (*Id*.)

Upon § 2254 review, these factual findings by the state court are presumed to be correct and Petition must present "clear and convincing evidence" to overturn them. 28 U.S.C. § 2254(e)(1). Petitioner offers no such evidence, merely repeating his assertions that because a police officer was stationed at the hospital, Valkner should have known about the death as soon as it occurred and turned on the recording equipment earlier. (Pet'r's Reply, Dkt. # 27, at 2). The fact that an officer was present at the hospital, however, does not mean that such officer would necessarily have become immediately aware of Gayden's death precisely when it occurred. Petitioner has no evidence beyond his suspicions to indicate that the police learned of the death prior to 3:55 a.m. and deliberately avoided having Valkner learn that fact. As such, the conclusion that Petitioner's statements were admissible is reasonable. Because the state appellate

court reasonably found that Petitioner's statements were admissible evidence under Illinois law, its conclusion that trial counsel was not ineffective for filing a futile motion to suppress them is a reasonable application of *Strickland*.[5]

**Claim 1(b): Unfulfilled promise that Petitioner would testify**:

Petitioner also contends that trial counsel was ineffective for promising in opening statements that Petitioner would testify, yet ultimately failing to call Petitioner to testify on his own behalf. The government argues that this ground is procedurally defaulted, because Petitioner failed to raise it at every level of Illinois state court review. To escape procedural default, an issue raised in Illinois state court must be submitted for "one complete round" of the state review process – including being raised in a PLA to the state supreme court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This requirement applies both to direct appeals and to collateral review proceedings. *See White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999).

Petitioner raised this argument for the first time in his pro se post-conviction petition, and it was also included in the counseled post-conviction appeal. The issue was omitted, however, from Petitioner's counseled post-conviction PLA to the state supreme court and was accordingly not subject to one complete round of state court review. To get around this deficiency, Petitioner argues that Claim 1(b) *was* alleged in his attempted pro se PLA, which the Illinois Supreme Court refused to file because Petitioner was represented by counsel. In order to decide whether Plaintiff's attempted pro se PLA allows this claim to escape procedural default, the Court must

---

[5] Because this reasoning that the statements fell within an exception to the inadmissibility presumption is enough to support the state court's application of *Strickland*, the Court need not address the Illinois Appellate Court's alternate holding that the statements were also sufficiently reliable and voluntary to overcome that presumption.

confront two distinct issues: (1) whether Petitioner's pro se PLA qualified as fair presentment of his claim to the Illinois Supreme Court, and (2) whether the Illinois procedural rule against hybrid representation constitutes an adequate and independent state grounds for rejecting Petitioner's claim, such that federal habeas review is unavailable.

*Fair presentment*:

Before seeking federal habeas relief, a petitioner must "fairly present his federal claims to the state courts" through one complete round of state court review. *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). A petitioner fairly presents an argument to the state courts by "articulating both the operative facts and applicable law" entitling him or her to relief. *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). Pro se petitions are liberally construed when determining whether a claim has been fairly presented. *See Ward v. Jenkins*, 613 F.3d 692, 697 (7th Cir. 2010).

Whether a habeas petitioner's unsuccessful attempt to supplement counseled briefs with a pro se filing qualifies as fairly presenting a claim is a matter of much debate. A number of district court judges in this circuit have found procedural default in such situations. *See, e.g.*, *Harris v. Rednour*, No. 11 C 410, 2011 WL 5039811, at *3 (N.D. Ill. Oct. 21, 2011) (finding default where "the state court denied [petitioner's] request to file additional pro se briefs"); *Williams v. Hulick*, No. 07 C 0056, 2010 WL 1292450, at *4 (N.D. Ill. Mar. 25, 2010) ("Because the court did not review or consider the merits of Petitioner's arguments, his claims were not fairly presented at that stage"); *Gavin v. Wright*, No. 07-3018, 2007 WL 1544177, at *3 (C.D. Ill. May 24, 2007) (suggesting that petitioner's claims are procedurally defaulted because "[w]hile

[petitioner] attempted to file a pro se supplemental brief raising ineffective assistance of trial counsel, the Appellate Court struck the document"). Other courts, however, have declined to find lack of fair presentment under the very same circumstances. *See, e.g.*, *Smith v. Pfister*, No. 09 C 01346, 2013 WL 1568063, at *7 (N.D. Ill. Apr. 11, 2013) (finding fair presentment because the petitioner's attempted filings "present the operative facts and controlling federal legal principles" relevant to his claims); *Jones v. Martin*, No. 11 CV 6046, 2012 WL 2115930, at *4 (N.D. Ill. June 7, 2012) (finding fair presentment despite state court's refusal to file petitioner's brief, because there was no "meaningful distinction between 'filing' and 'submitting' a brief" for purposes of presenting a brief to the state court). Further muddying the waters, the Seventh Circuit has confronted this precise situation and ruled that it qualifies as fair presentment – but in an unpublished, non-precedential order. *See Kizer v. Uchtman*, 165 F. App'x 465, 467 (7th Cir. 2006) (holding that because the state court had discretion to allow hybrid representation, petitioner's attempt to file a supplemental pro se brief had "raised issues using a method that would allow the court, in its discretion, to consider federal claims of unconstitutionality").

The Court finds fair presentment in this case. As the Seventh Circuit noted in its (non-precedential) opinion in *Kizer*, Petitioner here "practically begged the state courts to consider his claims" in attempting to file his pro se brief. The purpose of requiring a petitioner to fairly present his claims to the state courts is to give states a chance to remedy constitutional violations before the federal courts swoop in and compel them to do so. *See O'Sullivan*, 526 U.S. at 845 ("[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to federal courts"). Petitioner did his best to give the Illinois Supreme Court just such an opportunity, as his

attempted supplemental brief clearly lays out both the factual and legal basis for his claims. While the record is unclear as to the exact date Petitioner's pro se brief was submitted to the Illinois Supreme Court, it was clearly before the court ruled on his counseled PLA; the letter informing Petitioner his submission would not be accepted was dated in October 2014, while the Illinois Supreme Court did not reject his counseled PLA until November. As such, there is no reason to suspect that Petitioner was attempting to get a second bite at the apple or otherwise abuse the state appellate system. Like the petitioner in *Smith v. Pfister*, Petitioner's pro se documents "do not appear to have been filed to frustrate the efficient administration of the judicial process, but rather to raise and preserve issues that would otherwise be waived." *Smith*, 2013 WL 1568063, at *7. Accordingly, Petitioner has fairly presented Claim 1(b) to the Illinois courts.

*Adequate and Independent State Grounds*:

Even if Petitioner's pro se submission qualifies as fair presentment of Claim 1(b) to the Illinois Supreme Court, however, this claim may still be procedurally defaulted for habeas purposes if the state court refused to reach the merits of the claim based on adequate and independent state grounds for denying review. Specifically, the state ground at issue is Illinois' rule barring hybrid representation (that is, representation both pro se and by counsel at the same time). The Illinois Supreme Court explicitly invoked this rule in the letter rejecting Petitioner's attempted pro se filing. (Gov't Ex. S.) This letter cites to two Illinois cases establishing the bar to hybrid representation, making it clear that the rule against it is independent of any federal law

question. Accordingly, the issue before the Court is whether this ground was "adequate" for purposes of barring Petitioner's claim.

A state procedural rule is "adequate" only where the state court applies that rule "in a consistent and principled way." *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990) ("A basis of decision applied infrequently, unexpectedly, or freakishly may be inadequate"). District courts in this circuit are once again split as to whether the Illinois rule against hybrid representation is sufficiently consistent to constitute an adequate state ground resulting in procedural default of a habeas claim. The majority of decisions appear to hold that the rule is an adequate and independent state law ground barring a federal habeas court from considering issues raised in a rejected pro se filing. *See, e.g.*, Galvez, 2012 WL 588809, at *3 (holding that in Illinois, the rule against hybrid representation is "firmly established and regularly followed" such that a state court's rejection of a pro se supplemental brief rests on an independent and adequate state ground); *Cumbee v. Hardy*, No. 11 C 50118, 2012 WL 138647, at *2 (N.D. Ill. Jan.18, 2012) (finding the Illinois Appellate Court's rejection of a pro se supplemental brief to be "an independent and adequate state procedural ground for rejecting… the claims included therein"); *Dolis v. Gilson*, 07 C 1816, 2009 WL 5166228, at *8 (N.D. Ill. Dec. 23, 2009) (holding that the "clearly established state procedural rule" prohibiting hybrid representation was an independent and adequate state ground). Other courts have noted, however, that there is a degree of laxity in the Illinois courts' enforcement of this rule that may render it inadequate for purposes of procedural default. *See Parker*, 2011 WL 221834, at *8 (collecting cases and concluding that "the Illinois reports are replete with decisions in non-capital cases in which courts permitted defendants to file supplemental pro se briefs, without suggesting that this was the least bit out of

the ordinary"). This raises the troubling possibility that the rule could be applied in discriminatory fashion to snuff out habeas claims by preventing prisoners from escaping procedural default. *See Prihoda*, 910 F.2d at 1383 (noting that where a state basis for decision is not applied consistently, "the lack of notice and consistency may show that the state is discriminating against the federal rights asserted").

The Court declines to resolve this district's split in authority regarding the adequacy of Illinois' hybrid representation rule, because even if not procedurally defaulted Claim 1(b) fails on the merits, as discussed below. S*ee Diaz v. Pfister*, No. 12 C 286, 2013 WL 4782065, at *13 (N.D. Ill. Sept. 4, 2013) (noting the "split in authority in this district regarding the adequacy of Illinois' rule barring hybrid representation" and declining to resolve that split where claims at issue could be resolved against petitioner on the merits).

*Merits of Claim 1(b)*:

Petitioner claims that trial counsel was constitutionally ineffective in promising the jury that they would hear Petitioner's testimony and then reneging on that promise. In the last reasoned state court ruling on this claim, the Illinois Appellate Court correctly recited the *Strickland* standard for ineffective assistance. (Gov't Ex. L at ¶ 56.) The Appellate Court then applied *Strickland* and rejected Petitioner's claim on the second prong of the ineffective assistance test. The court found that even if trial counsel's conduct was objectively unreasonable,[6] there was no prejudice to Petitioner because the wealth of evidence against

---

[6] Because the Appellate Court does not reach the issue of whether trial counsel's promise that Petitioner would testify was actually deficient, it is not necessary to decide that issue on habeas review. The Court notes, however, that in light of the self-incriminating nature of Petitioner's video testimony and the extensive colloquy between

Petitioner suggested that acquittal was unlikely regardless of what trial counsel did in his opening statement. (*Id.* at ¶¶ 58-59.)

The Appellate Court was not objectively unreasonable in finding prejudice unlikely. As the court noted, the evidence against Petitioner was overwhelming. There was no dispute whatsoever that Petitioner was present at the scene and that he was deliberately provoking rival gang members; multiple witnesses testified that Petitioner had been shouting "Cobra killer" and making gang signs at the Cobras across the street. Jacoby Jones testified that he heard Petitioner request a gun be brought to the scene, and Roquelin Bustamante testified that he heard Petitioner tell Serrano to "wreck 'em" immediately prior to the shooting. Most damning of all was the video of Petitioner's own recorded statements to police. In it, Petitioner admitted that he was looking for a fight that evening and that he had recruited other members (including Serrano, the actual shooter) to attend the fight with him. He admitted that he knew Serrano brought a gun. While he claimed he hadn't wanted a gun at the fight he also suggested he was happy or excited to have it, describing his reaction as "I was like, yes we got a gun here too. This evens everything's [sic] out." Even his insistence that he hadn't wanted a gun in the first place would have won him few points with the jury, coupled as it was with a casual suggestion that he brings guns to gang confrontations frequently enough to have developed habits on the subject ("I always wait until midnight before I bring out guns"). Moreover, as the video continues, Petitioner admits telling Serrano to "get 'em" or "bust them" and states that he was intentionally luring Cobras closer so that Serrano would have an easier shot. He even states that he asked

---

Petitioner and the judge emphasizing his rights, there are strong reasons to suspect that the about-face was either legitimate trial strategy or a voluntary change of heart by Petitioner for which counsel cannot be faulted.

Serrano to give him the gun and strongly suggests that he would have shot the Cobras himself if Serrano had done so.

Having already admitted to essentially every fact relevant to guilt in his videotaped testimony, Petitioner cannot convincingly allege that he suffered prejudice from counsel's unfulfilled promise that he would testify. Accordingly, Petitioner is not entitled to habeas relief on Claim 1(b).

**Claim 1(c): Failure to question jurors regarding gang bias**

Petitioner's final claim regarding ineffective assistance of trial counsel alleges that trial counsel failed to question prospective jurors as to whether or not they held biases against gang members. Petitioner raised this issue on direct appeal of his conviction, but omitted it from every other stage of review; this claim is absent from the PLA stage of his direct appeal as well as from all three levels of post-conviction collateral review. Because Petitioner has failed to present this claim through one full round of state court review, it is unambiguously defaulted.

There are, however, two exceptions through which a federal habeas court may reach the merits of a claim which would otherwise be unreviewable due to procedural default. A claim may fall within the "cause and prejudice" exception if a petitioner show that an "objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule" and also demonstrates actual prejudice resulting from the alleged violation of federal law. *Strickler v. Greene*, 527 U.S. 263, 282 n. 24 (1999). Alternatively, a claim is reviewable despite procedural default under the "fundamental miscarriage of justice" exception if a petitioner can show that "the constitutional violation has probably resulted in a conviction of one who is actually

innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002). As stated above, the evidence of Petitioner's guilt was overwhelming; accordingly, the Court finds that the "fundamental miscarriage of justice" exception does not apply because Petitioner has failed to present a colorable argument that he is actually innocent. Therefore, Claim 1(c) is reviewable only if Petitioner can show cause for the default and prejudice from the underlying failure of trial counsel.

As grounds for his failure to preserve Claim 1(c) in his first round of appeals, Petitioner asserts that his appellate counsel was constitutionally ineffective for not including the claim in Petitioner's direct appeal PLA. A habeas petitioner may use ineffective assistance of appellate counsel as cause to excuse the default of an underlying ineffective assistance of trial counsel claim. *See Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). However, this "cause" is only available to a petitioner if his ineffective assistance claim regarding this failure by *appellate* counsel was itself presented through one complete round of state court review. *Id*. In other words, in order to cite ineffective assistance of his appellate counsel as cause for the procedural default, Petitioner would have had to raise this ineffectiveness claim during his postconviction proceedings. He has failed to do so, as none of his postconviction briefs accuse appellate counsel of ineffectiveness for failing to preserve Claim 1(c).

Petitioner mentions the U.S. Supreme Court ruling in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) as a possible excuse for this failure. That case establishes limited circumstances in which a petitioner who files a pro se state post-conviction petition can establish cause excusing the default of ineffective assistance of trial counsel claims. *Trevino*, however, depended on features of Texas law that made it virtually impossible on direct review for appellate counsel to

adequately present a claim of ineffectiveness of *trial* counsel. *See Trevino*, 133 S.Ct. at 1918. *Trevino*, in essence, provides an excuse for petitioners who wish to claim trial counsel was ineffective but had only one chance – collateral review – to do so, and who failed to preserve the issue because they were proceeding pro se. Petitioner now attempts to apply *Trevino* to an ineffectiveness of *appellate* counsel claim that he raises only to show cause for defaulting on an ineffectiveness of trial counsel claim. He therefore seems to be arguing that his ineffectiveness of trial counsel claim is not defaulted because appellate counsel was ineffective, and that this ineffectiveness of appellate counsel is not defaulted because Petitioner's postconviction brief was filed pro se and cannot be expected to preserve the issue. *Trevino* stands for no such proposition. Nor could it, because under Petitioner's chain of reasoning procedural default would simply not exist; any claim not raised in a counseled appeal is excused because the default is appellate counsel's fault, and any claim not raised in a pro se appeal (including the aforementioned failure of appellate counsel) is excused because pro se litigants get a free pass. If Petitioner took issue with appellate counsel's failure to raise Claim 1(c), he had ample opportunity to complain of such in his pro se post-conviction petition, his *counseled* post-conviction appeal, his counseled post-conviction PLA, or even his (attempted) pro se post-conviction PLA. He failed to do so, and as such has failed to show cause why his default of Claim 1(c) should be excused.

CLAIM 2: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner argues that his appellate counsel was constitutionally ineffective for having failed to raise two issues on direct appeal: (1) that trial counsel was ineffective for not moving to

suppress Petitioner's statements to Valkner, and (2) that trial counsel was ineffective for making an unfulfilled promise that Petitioner would testify. The Illinois Appellate Court considered both these arguments as to alleged failures of appellate counsel, and rejected them because trial counsel was not ineffective and accordingly appellate counsel was not required to make such a claim. (Gov't Ex. L, at ¶ 52) (noting that "counsel has no duty to raise non-meritorious issues on appeal.")

Because the underlying errors Petitioner alleges were committed by trial counsel do not constitute ineffective assistance – as discussed above – it follows that the failure to base an appeal on such conduct is also not ineffective assistance. Petitioner's claims relating to his appellate counsel therefore do not warrant habeas relief.


CLAIM 3: VIOLATION OF ILLINOIS SUPREME COURT RULE 431(B)

Petitioner argues that his trial judge failed to comply with Illinois Supreme Court Rule 431(b) by not affording each potential juror the opportunity to express their acceptance of the principles in *People v. Zehr*, 469 N.E.2d 1062 (Ill. 1984). Despite Petitioner's assertion that this failure violated his right to due process of law by denying him an impartial jury, this is not a federal constitutional claim cognizable on habeas review. Under § 2254, a state prisoner may obtain federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004).

Here, the violation of Illinois Supreme Court Rule 431(b) that Petitioner complains of cannot entitle him to federal habeas relief. Federal law does not require that prospective jurors be affirmatively asked if they agree with the *Zehr* principles – a point noted by the many federal judges in this circuit who have rejected claims identical to Petitioner's. *See, e.g., Harris v. Harrington*, No. 13-CV-2105, 2014 WL 1304995, at *4 (C.D. Ill. Apr. 1, 2014) ("There is no federal right to have potential jurors questioned in the manner set out in Illinois Supreme Court Rule 431(b)"); *Rosario v. Akpore*, 967 F. Supp. 2d 1238, 1250 (N.D. Ill. 2013) (noting that a "violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of the supreme court's rules"). Because Claim 3 is not cognizable on federal habeas review, the Court need not address the government's arguments that it is also procedurally defaulted.

CERTIFICATE OF APPEALABILITY:

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, a district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant." A certificate of appealability "may be issued only if the prisoner has at least one substantial constitutional question for appeal." 28 U.S.C. § 2253(c)(2). For the reasons stated above, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right, because he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently or that his petition adequately shows a sufficient chance of the denial of a constitutional rights that he deserves

encouragement to proceed further." *Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). Accordingly, the court declines to issue Petitioner a certificate of appealability.

## Conclusion

For the reasons set forth above, the Court denies Petitioner's § 2254 motion. Moreover, because he has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2). This case is terminated.

**SO ORDERED.**                                    **ENTERED:   March 23, 2015**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**